UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

KENYATTA CURSEY,

    Plaintiff,

v.                                                          Case No. 21-cv-0906-bhl

ZACHARY SCHROEDER,

    Defendant.

## DECISION AND ORDER GRANTING
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Kenyatta Cursey, an inmate at the Redgranite Correctional Institution, is representing himself in this 42 U.S.C. §1983 action. He is proceeding on an Eighth Amendment claim that Defendant was deliberately indifferent to Cursey's fear of being sexually harassed by a cellmate and on a Fourteenth Amendment equal protection claim based on allegations that Defendant was more responsive to White and/or gay inmates' complaints. Defendant has moved for summary judgment. On September 19, 2022, Cursey filed a motion for leave to file a surreply.[1] For the reasons explained below, the Court will grant Defendant's motion.

### BACKGROUND

At the relevant time, Cursey was an inmate at Redgranite Correctional Institution, where Defendant worked as unit manager, program supervisor, and a Prison Rape Elimination Act (PREA) facility intake staff member. On August 13, 2020, inmate J.E. (who for privacy reasons will be identified only by his initials) was transferred to Housing Unit G-West where he shared a cell with

---

[1] The record does not support Cursey's claimed need to file a surreply. Defendant does not raise new arguments in his reply brief; he merely replies to the arguments Cursey raised in his response brief. Nevertheless, the Court will grant Cursey's motion and allow the surreply, which, as explained below, does not impact the Court's analysis.

Cursey. In the week prior to October 26, 2020, Cursey had submitted four requests to change cellmates. Cursey explains that, on October 26, 2020, J.E. reported to health services that he was not feeling well, so consistent with COVID policies at the time, he and J.E. were required to move to another unit to quarantine. Cursey told a nurse that he believed J.E. was not actually sick but wanted to remain in the same cell with him. Cursey states that neither he nor J.E. ever tested positive for COVID. Dkt. No. 58 at ¶¶1-2, 13, 44, 47; Dkt. No. 49 at 1.

By the time Cursey's unit manager, Joli Grenier, received Cursey's requests to change cellmates, Cursey and J.E. had already been moved to quarantine. Grenier returned the requests to Cursey and told him she would review them after he was done with quarantine. Grenier explains that inmates do not typically get to choose who they live with, and cell changes are usually made only for security reasons, for medical or psychological concerns, or because an inmate is at risk for abusiveness and/or victimization. Grenier asserts that Cursey had not reported any concerns to her about being sexually abused or harassed by J.E. Dkt. No. 58 at ¶¶48-49, 53-54.

Shortly after Cursey and J.E. were moved to the quarantine unit, Cursey reported to Defendant that he did not like living with J.E. According to Defendant, Cursey said only that J.E. was "weird" and that he "sucks on a spoon and looks at him when he is eating sometimes." Defendant asserts that Cursey never mentioned that he was afraid of J.E. touching him while he was sleeping or that he was being sexually harassed or abused by J.E. Defendant further asserts that Cursey never stated that he was making a PREA complaint, only that he wanted to move to a different cell. Dkt. No. 58 at ¶¶56-61.

Cursey remembers his interaction with Defendant differently. He states that he informed Defendant that he has "a PREA issue" and that he wanted "to make a PREA complaint." He told Defendant that J.E. "sucks on his spoons while trying to look into [his] eyes and moaning like this is what he will do to [his] dick." He explained that he had tried turning his back on J.E. while he ate,

2

Case 2:21-cv-00906-BHL    Filed 10/07/22    Page 2 of 8    Document 62

but when he turned around, he had seen J.E. twisting his nipples while watching him. Cursey asserts that he also told Defendant that he had started stacking books on the side of his bed because he was afraid that J.E. might be touching him in his sleep." Dkt. No. 49 at 1-2; Dkt. No. 1 at ¶8.

Defendant asserts that he did not believe Cursey's concerns met the definition of a PREA complaint because Cursey had not told him anything that amounted to sexual harassment or abuse. Defendant explains that Cursey mentioned that he had previously written to Grenier about his issues, so Defendant told Cursey to wait and then he called Grenier to investigate whether there was any issue with Cursey and J.E. living together. Grenier told Defendant that, to her knowledge, there was no reason Cursey could not share a cell with J.E. Defendant explains that he did not believe there was any indication that J.E. posed a threat of sexual harassment or abuse to Cursey. And, in light of the serious concerns related to COVID, Defendant believed it was important that Cursey return to his cell to quarantine. Accordingly, after talking to Grenier, Defendant directed Cursey to return to his cell. Dkt. No. 58 at ¶¶62-67.

The parties dispute the specifics of what happened next, but they agree that Cursey ultimately decided he would not return to his cell as directed by Defendant. Defendant issued him a conduct report for disobeying orders to return to his cell, and Cursey was placed in temporary lockup, where he remained until his disciplinary hearing on November 12, 2020. Cursey was found guilty of disobeying orders and was given sixteen days of room confinement (time served) as a punishment. Cursey did not room with J.E. after he was released from temporary lockup status. Dkt. No. 58 at ¶¶67-75; Dkt. No. 50 at 1-2.

## LEGAL STANDARD

Summary judgment is appropriate when the moving party shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "Material facts" are those under the applicable substantive law that "might affect the

3

outcome of the suit." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. All reasonable inferences are construed in favor of the nonmoving party. *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004). The party opposing the motion for summary judgment must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co*., 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted). "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Id*. Summary judgment is properly entered against a party "who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Parent v. Home Depot U.S.A., Inc.*, 694 F.3d 919, 922 (7th Cir. 2012) (internal quotations omitted).

## ANALYSIS

Cursey asserts that Defendant violated the Eighth Amendment by refusing to move Cursey to another cell after he complained about his cellmate's behavior. He also asserts that Defendant violated the Fourteenth Amendment when he handled Cursey's PREA complaint differently than he handled another inmate's PREA complaint. Defendant is entitled to summary judgment on both claims.

1. **No jury could reasonably conclude that Defendant was deliberately indifferent to an excessive risk of harm to Cursey.**

In order to prevail on a failure-to-protect claim, a plaintiff must show that he faced a substantial risk of serious harm and that the defendant was deliberately indifferent to that risk. *Brown v. Budz*, 398 F.3d 904, 910 (7th Cir. 2005) (citations omitted). The Supreme Court has explained that "the deprivation alleged must be objectively, sufficiently serious," amounting to a "denial of the minimal measure of life's necessities." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). As far as determining the point at which the risk of harm becomes sufficiently substantial, the Seventh Circuit

4

has explained that the risk must be so great that the harm is almost certain to materialize if nothing is done. *Brown*, 398 F.3d at 911. Finally, to meet the subjective prong, a plaintiff must show that the defendant was both "aware of the facts from which an inference could be drawn that a substantial risk of serious harm exists" and that the defendant "dr[ew] the inference." *Id.* at 913.

The parties dispute what Cursey reported to Defendant, but at this stage, the Court must draw all reasonable inferences in the non-moving party's favor. As such, the Court will assume that Cursey told Defendant that he was making a PREA complaint and that J.E. lewdly sucked on his spoons while staring at Cursey and making moaning sounds. The Court will also assume that Cursey informed Defendant that J.E. occasionally twisted his nipples while staring at Cursey and that Cursey believed J.E. might be touching him while he slept.

Cursey explains that he was uncomfortable around J.E. and feared that J.E.'s crude and suggestive actions would escalate to an assault. It is well established that a sexual assault is an objectively serious harm. It is less clear, however, that the conduct Cursey describes—suggestively sucking on spoons and occasionally touching one's nipples—is sufficiently serious to amount to a "denial of the minimal civilized measure of life's necessities." To be sure, the described conduct is offensive, but the record does not show that J.E. ever made actual threats or comments that would suggest he intended to move beyond this boorish behavior. And although Cursey feared J.E. *might* touch him in his sleep, there is no evidence that those fears ever materialized or even that those fears were reasonable. As such, it is questionable whether a jury could conclude that Cursey suffered a substantial risk of a serious harm.

Putting that question aside, Cursey's claim fails for an independent reason. No reasonable jury could conclude that Defendant was deliberately indifferent to whatever risk Cursey faced. Cursey and J.E. had just moved to a new housing unit to quarantine with what, at that time, was understood to be a very contagious and potentially dangerous virus. Cursey points out that he had

not yet received his COVID test results, so it was unknown to him or Defendant whether he was infected. Dkt. No. 49 at 1. Despite the possibility that Cursey was COVID-positive, Defendant took Cursey's statement and then had him wait outside his cell while he called Grenier, Cursey's prior housing unit officer. Defendant had only just met Cursey, but he knew that he and J.E. had been living together for more than two months, so he asked Grenier if there was any reason why they could not be housed together for fourteen more days while they quarantined. Grenier informed Defendant that she did not know of any reason. Grenier explains that Cursey had recently submitted requests for a different cellmate, but Cursey did not explain *why* he wanted to change cellmates. Cursey explains that he did not raise his issues with J.E. to Grenier because he was "working on alleviating them [him]self." *Id.* That approach was reasonable, but the consequence of his silence was that Grenier was unaware of his concerns with J.E.'s inappropriate behavior. Thus, as far as she knew, Cursey and J.E. had been living together without incident for more than two months, which is what she communicated to Defendant.

From Defendant's perspective, Cursey's complaints were undermined by Grenier's report that the two had lived together for months without incident or complaint. And Cursey offers no evidence suggesting that Defendant had reasons other than Cursey's say-so to know that Cursey faced a risk of harm. As such, no jury could reasonably conclude based on the information available to Defendant that he *knew* Cursey would face a substantial risk of serious harm if he quarantined with J.E. Cursey argues that, regardless of Grenier's report, Defendant should have believed him, but "prison guards are neither required nor expected to believe everything inmates tell them." *Olson v. Morgan*, 750 F.3d 708, 713 (7th Cir. 2014). Based on all the information Defendant had, it would have been logical for him to infer that Cursey's concerns were false or at least exaggerated. Because no reasonable fact finder could conclude that Defendant "actually drew the opposite inference," s*ee id.*, Defendant is entitled to summary judgment on this claim.

### 2. No jury could reasonably conclude that Defendant violated the Fourteenth Amendment because he was more responsive to White and/or gay inmates' PREA complaints.

Cursey, who is Black and heterosexual, asserts that Defendant handled his PREA complaint differently than he handled PREA complaints from inmates who are White and/or gay. Defendant disputes Cursey's claim and states under penalty of perjury that he uses the same intake process for each inmate and that he is not less responsive to PREA complaints made by inmates of a certain ethnicity or sexual orientation. Dkt. No. 58 at ¶¶24-25. He points out that Cursey has identified only one other inmate whose complaint Defendant processed, and as was with the case with Cursey's complaint, Defendant concluded that that the complaint did not meet the definition of a PREA violation. *Id.* at ¶¶40-41. Cursey concedes this point, but he highlights that, unlike with his complaint, Defendant created a report of his recommended finding and forwarded the report to a reviewing body as required by institution policy. Dkt. No. 49 at 5. Cursey notes that Defendant created no such report for his PREA complaint, so there was no review of Defendant's decision. *Id.*

The Supreme Court long ago explained that "[p]roof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 265 (1977). Cursey has shown only that Defendant handled his PREA complaint differently than he handled another inmate's complaint. He offers no evidence explaining *why* Defendant handled the complaints differently. Defendant asserts that he did not prepare a report because he did not believe that Cursey was filing a PREA complaint; he thought Cursey simply wanted a different cellmate. To survive summary judgment, Cursey needed to present evidence from which a jury could reasonably conclude that Defendant's decision not to prepare a report of his decision was motivated by Cursey's race and sexual orientation. Cursey provides no such evidence. He merely speculates that his race and sexual orientation motivated Defendant. A non-moving party "is entitled to all reasonable inferences in his favor, but inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion."

*Lavite v. Dunstan*, 932 F.3d 1020, 1029 (7th Cir. 2019). Accordingly, Defendant is entitled to summary judgment on this claim.

## CONCLUSION

**IT IS THEREFORE ORDERED** that Defendant's motion for summary judgment (Dkt. No. 34) is **GRANTED**. The clerk's office shall enter judgment accordingly.

**IT IS FURTHER ORDERED** that Cursey's motion for leave to file a surreply (Dkt. No. 55) is **GRANTED**.

Dated at Milwaukee, Wisconsin on October 7, 2022.

s/ *Brett H. Ludwig*
BRETT H. LUDWIG
United States District Judge

---

This order and the judgment to follow are final. Plaintiff may appeal this Court's decision to the Court of Appeals for the Seventh Circuit by filing in this Court a notice of appeal within **30 days** of the entry of judgment. *See* Fed. R. App. P. 3, 4. This Court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Fed. R. App. P. 4(a)(5)(A). If Plaintiff appeals, he will be liable for the $505.00 appellate filing fee regardless of the appeal's outcome. If Plaintiff seeks leave to proceed *in forma pauperis* on appeal, he must file a motion for leave to proceed *in forma pauperis* with this Court. *See* Fed. R. App. P. 24(a)(1). Plaintiff may be assessed another "strike" by the Court of Appeals if his appeal is found to be non-meritorious. *See* 28 U.S.C. §1915(g). If Plaintiff accumulates three strikes, he will not be able to file an action in federal court (except as a petition for habeas corpus relief) without prepaying the filing fee unless he demonstrates that he is in imminent danger of serous physical injury. *Id.*

Under certain circumstances, a party may ask this Court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of judgment. The Court cannot extend these deadlines. *See* Fed. R. Civ. P. 6(b)(2).

A party is expected to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.